*United States v. Brown*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2014

(Submitted: February 17, 2015          Decided:  June 14, 2016)

Docket No. 13-1706

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

NATHAN BROWN,

*Defendant-Appellant.*

_____

Before: POOLER, SACK, and DRONEY, *Circuit Judges*.

Appeal from a January 29, 2013 judgment of the United States District

Court for the Northern District of New York (Sharpe, *J.*), sentencing Defendant-

Appellant Nathan Brown to 60 years' imprisonment. The sentencing transcript

suggests that the district court may have based its sentence on a clearly

erroneous understanding of the facts. Accordingly, we remand for resentencing.

Judge Droney dissents in a separate opinion.

_____

Brenda K. Sannes and Richard D. Belliss, Assistant
United States Attorneys, *for* Richard S. Hartunian,
United States Attorney for the Northern District of New
York, Syracuse, NY, *for Appellee*.

S. Michael Musa-Obregon, Maspeth, NY, *for Defendant-*
*Appellant*.

POOLER, *Circuit Judge*:

Nathan Brown pleaded guilty to three counts of production of child

pornography, in violation of 18 U.S.C. § 2251(a), and two counts of possession of

child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). The district court

(Sharpe, *J.*) imposed a sentence of 60 years' imprisonment. Brown now

challenges that sentence, arguing that the district court miscalculated his

guidelines range and that the sentence is otherwise procedurally and

substantively unreasonable. We reject Brown's challenge to the guidelines

calculations, but we remand for resentencing to ensure that the sentence is not based on a clearly erroneous understanding of the facts.

# BACKGROUND[1]

In February 2012, federal investigators discovered eleven images on a child-pornography website that appeared to have been uploaded by the same person. Two of the images depicted the same eight-year-old girl. By examining metadata from one of the images, investigators determined that the image had been taken using a Motorola Droid X cell phone. The metadata also revealed GPS coordinates associated with the image. With assistance from the cell phone carrier in that region for the Motorola Droid X, investigators determined the approximate area where the photograph was taken. They then spoke with the

---

[1] We set forth the facts in detail because we think it important to a full appreciation of the rationale underlying the district court's sentence. *See United States v. C.R.*, 792 F. Supp. 2d 343, 378-404 (E.D.N.Y. 2011) (describing in detail the injury suffered by victims as a result of the dissemination of child pornography), *vacated on other grounds sub nom. United States v. Reingold*, 731 F.3d 204 (2d Cir. 2013); *cf. also Reingold*, 731 F.3d at 233 (Sack, *J.*, concurring) ("I have no doubt that there are appeals in such cases that require the reviewing court to engage in a carefully, even painfully, detailed analysis of the child pornography and abuse at issue."). We do so with some misgivings, however, as we fear that an easily accessible detailed description of the events might worsen the mental anguish suffered by the victims.

superintendent of schools within that area, who identified the girl after viewing a sanitized version of the photograph.

Federal agents visited the girl's home and spoke with her mother, who identified her daughter in four images of child pornography. The girl's mother also recognized her thirteen-year-old niece in two of the images. The mother told investigators that the two girls would sometimes spend time together at a trailer home that had been rented by defendant Nathan Brown and the mother's sister.

Investigators interviewed the eight-year-old girl, who told them that, while babysitting, Brown would "play house" with the girls, and she would play the "baby" and wear a diaper. Brown would periodically "change" the diaper as if it were soiled. She reported that, while doing so, Brown had touched her as he "cleaned" her vaginal area with a baby wipe. Brown also took pictures of the girls as this was occurring.

Both girls recognized themselves in the photographs that they were shown by investigators, and they remembered a number of the pictures that had been taken while they were awake. One of the girls told investigators that Brown

4

offered to buy her an iPad if she allowed him to take more pictures of her, which she refused.

Based on the information provided by the girls and their parents, federal agents obtained a search warrant for Brown's residence and electronic devices. They executed the warrant at Brown's home and found him attempting to delete child pornography from his computer. The agents arrested Brown and seized his computers, cell phones, storage devices, and cameras.

After his arrest, Brown told investigators that he had been viewing child pornography online daily using software that hid his IP address. He admitted to taking nude photographs of children with his phone, including approximately 100 photographs of the two girls depicted on the child-pornography website that he uploaded from his phone to his computer. Images of the eight-year-old girl included a picture of her wearing only a shirt, with her vagina exposed, and with an open diaper next to each of her legs. In another, the girl was naked in a bathtub, again with her genitalia exposed. Additional pictures included close-up images of the girl's vagina, an image of a male hand pulling aside the girl's underwear, and an image of a child's hand holding an adult penis. The girl is

sleeping in several of these images. The images of the girl's cousin showed her sleeping, with her underwear pulled to the side and her vagina exposed, with her breast exposed, with an adult penis next to her mouth, and with an adult penis on her lips. The images also included close-up pictures of her vagina.

Brown told investigators that he had also taken sexually explicit photographs and videos of a third victim, who was eight years old at the time. Investigators found images and videos of this third victim on Brown's computer. One video showed Brown touching his penis to her hand and ejaculating on it. Another showed him ejaculating on her feet, and a third showed him pulling down her underwear and spreading her vagina with his fingers. Brown admitted to pulling down her underwear and photographing her while she was sleeping. The third victim was "asleep the entire time during the production of the images and videos" and has "no knowledge of having been victimized by Brown." PSR ¶ 35.

After Brown's arrest, investigators conducted forensic analysis of his computers and phones. They found the eleven images that originally prompted the investigation on Brown's computers. They also discovered photos that Brown

had taken by hiding a pinhole camera in the bathroom of a home during a pool party and in the bathroom of a hotel at a public water park. The presentence report indicates that Brown also produced 33 files of a "Victim #4" and 2 files of a "Victim #5." PSR ¶ 36. The images of Victim #4 "depicted a female approximately eight to nine years old with black hair opening her vagina," and the images of Victim #5 "depict an unknown infant." PSR ¶ 37.

Brown's computers collectively contained over 25,000 still images and 365 videos of child pornography, including approximately 4 still images involving torture, 60 displaying bondage, 30 depicting bestiality, 1,873 involving sexual intercourse, 160 involving objects, and 18 involving infants. In total, 299 victims were identified in these images.

A grand jury indicted Brown with three counts of producing child pornography and two counts of possessing child pornography. Brown pleaded guilty to all five counts pursuant to a plea agreement. Under the plea agreement, Brown faced a mandatory minimum of 15 years' imprisonment, and he reserved the right to appeal any sentence greater than 405 months' imprisonment.

The probation office prepared a presentence investigation report in advance of Brown's sentencing. In determining Brown's guidelines range, the presentence report "grouped" Counts 1, 4, and 5, because those counts involved "substantially the same harm." U.S.S.G. § 3D1.2(b). The base offense level for this group was 32. The base offense level was then increased 14 levels because of five sentencing enhancements: (1) a four-level increase pursuant to Section 2G2.1(b)(1)(A) because "the offense involved a minor who had . . . not attained the age of twelve years;" (2) a two-level increase pursuant to Section 2G2.1(b)(2)(A) because "the offense involved[] the commission of . . . sexual contact;" (3) a four-level increase pursuant to Section 2G2.2(b)(4) because the offense "involved material that portrays sadistic or masochistic conduct or other depictions of violence;" (4) a two-level increase pursuant to Section 2G2.1(b)(5) because "the minor was . . . in the custody, care, or supervisory control of the defendant;" and (5) a two-level increase pursuant to Section 3A1.1(b)(1) because "the defendant knew or should have known that a victim of the offense was a vulnerable victim." These enhancements increased Brown's adjusted offense level for this group to 46.

The presentence report then repeated this process for Groups 2 and 3, which corresponded to Counts 2 and 3, and determined that each of those counts carried a total offense level of 42. This resulted in a "combined adjusted offense level" on all counts of 49. Brown received another five-level enhancement pursuant to Section 4B1.5(b) because he "engaged in a pattern of activity involving prohibited sexual conduct," raising the adjusted offense level to 54. Finally, Brown received a three-level reduction pursuant to Section 3E1.1 because he accepted responsibility for his crimes, resulting in a total offense level of 51. This was "treated as" an offense level of 43, the maximum offense level under the guidelines. *See* U.S.S.G. ch. 5, pt. A, application note 2.

At criminal history category I and offense level 43, Brown's recommended sentence under the guidelines was initially life imprisonment. Because each count was subject to a statutory maximum, however, Brown's recommended sentence became 110 years' imprisonment.

At sentencing, the government requested this maximum sentence. Defense counsel requested the mandatory minimum sentence of 15 years' imprisonment. The court heard from the families of the victims, who described the significant

behavioral issues from which the victims suffer and how they struggled to maintain relationships with family and friends. One victim's family told the court that the family "fel[t] violated in the worst imaginable way" and that the victim "lives in fear" and continues to "struggle with what happened." App'x at 83. The third victim's mother, however, did not submit a victim impact statement because her daughter "was unaware of the abuse" and there was "no negative impact" on her daughter. PSR ¶ 51.

The district court began its remarks at sentencing by discussing the various sentencing enhancements that applied in Brown's case. The court then discussed the seriousness of Brown's crimes, noting "the trauma to these three children [as] reflected in the presentence report [and] the statements of the relatives who have appeared on their behalf," which the court said "demonstrate[d] how drastic and dramatic the criminal conduct [was] here." App'x at 100. With respect to the possession counts, the court stated that the children depicted in the photographs Brown possessed "were hijacked by people exactly like . . . Brown, put through [torture, sexual intercourse, bestiality, and bondage], [and] photographed," and that the children would worry "for the rest of their li[v]e[s]" that "those

photographs are out there forever." App'x at 100. The court also said that Brown's crimes were "as serious . . . as federal judges confront" and that Brown was "the worst kind of dangerous sex offender." App'x at 101-02. In discussing the need to protect the public from Brown, the court said to him, "[I]t may be true that you could not help yourself, but it's also true that y[ou] destroyed the lives of three specific children . . . ." App'x at 101.

The court then imposed a sentence of 60 years' imprisonment. It explained its selection of this sentence as follows:

> Each of the first three counts deal with each of the three documented victims here, Jane Does I, II[,] and III; each of [th]em contains a mandatory minimum sentence of 15 years and a statutory maximum sentence of 30 years. So, on each of Counts I through III, you're looking at 15 to 30. Counts IV and V have a statutory maximum of 10 years each, and those are the counts that deal with the photographs obtained over the internet. When I look at the first three counts and look at the specific children that are involved, then I have to say to myself[,] which one of [th]em didn't you abuse? And my answer to that is there isn't none of the three that you didn't abuse.

> So when I look at the mandatory minimum on each of those children, I'm not willin[g] to walk away from any of the three. And as to those three counts, it is my sentence and I hereby sentence you to 20 years on each of those three counts to be served consecutively for a total of 60 years. On each of the production counts, there are a hundred ninety plus victims on those, I sentence you to the statutory maximum of 10 years on each of those two counts to be served

11

concurrently with the 60 years I have imposed as consecutive sentences on Counts I through III.

App'x at 102. In addition to the 60 years' imprisonment, the district court

sentenced Brown to a lifetime of supervised release and restitution in the amount

of $10,416.00.

Brown now appeals from this sentence, arguing that the district court

miscalculated his guidelines range and that the sentence is otherwise

procedurally and substantively unreasonable.

## DISCUSSION

"We review a sentence for procedural and substantive reasonableness,

which is akin to a 'deferential abuse-of-discretion standard.'" *United States v.*

*McCrimon*, 788 F.3d 75, 78 (2d Cir. 2015) (quoting *United States v. Cavera*, 550 F.3d

180, 189 (2d Cir. 2008)). We "must first ensure that the district court committed

no significant procedural error, such as failing to calculate (or improperly

calculating) the Guidelines range, treating the Guidelines as mandatory, failing

to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous

facts, or failing to adequately explain the chosen sentence—including an

explanation for any deviation from the Guidelines range." *Gall v. United States*,

12

552 U.S. 38, 51 (2007). "Once we have determined that the sentence is procedurally sound, we then review the substantive reasonableness of the sentence, reversing only when the trial court's sentence 'cannot be located within the range of permissible decisions.'" *United States v. Dorvee*, 616 F.3d 174, 179 (2d Cir. 2010) (quoting *Cavera*, 550 F.3d at 189).

We first address Brown's argument that the district court miscalculated his guidelines range. We then turn to whether Brown's sentence was otherwise procedurally and substantively reasonable.

**I. Brown's Challenge to the Guidelines Calculation**

**A. Waiver**

As an initial matter, the government argues that Brown has waived any objection to the guidelines calculation because his attorney did not object to that calculation in the district court. The government argues that Brown's attorney's failure to object means that this Court cannot conduct even plain error review of the district court's guidelines calculation.

"[W]aiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*,

13

304 U.S. 458, 464 (1938)). "[C]ourts applying [the] waiver doctrine have focused on strategic, deliberate decisions that litigants consciously make." *United States v. Dantzler*, 771 F.3d 137, 146 n.5 (2d Cir. 2014); *see also United States v. Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995) ("If . . . the party consciously refrains from objecting as a tactical matter, then that action constitutes a true 'waiver,' . . . ."). A true waiver will "extinguish" an error in the district court, precluding appellate review. *Olano*, 507 U.S. at 733. By contrast, "[i]f a party's failure to [object] is simply a matter of oversight, then such oversight qualifies as a correctable 'forfeiture' . . . ." *Yu-Leung*, 51 F.3d at 1122. Where a party forfeits an argument, we review for plain error. *See id.* Under that standard, an appellant must demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *McCrimon*, 788 F.3d at 78 (quoting *United States v. Marcus*, 560 U.S. 258, 262 (2010)). "[T]he plain error doctrine," however, "should not be applied stringently in the sentencing context,

14

where the cost of correcting an unpreserved error is not as great as in the trial context." *Id.* (alteration in original) (quoting *United States v. Wernick*, 691 F.3d 108, 113 (2d Cir. 2012)).

There appears to be some tension in our case law concerning whether a defendant's failure to object to the guidelines calculation constitutes a "true waiver." *Compare McCrimon*, 788 F.3d at 78 (reviewing challenge to guidelines calculation not raised in district court for plain error), *Wernick*, 691 F.3d at 113 (same), *and Dorvee*, 616 F.3d at 179 (same), *with United States v. Jass*, 569 F.3d 47, 66 (2d Cir. 2009) (concluding that failure to object to enhancement constituted true waiver), *United States v. Eberhard*, 525 F.3d 175, 179 (2d Cir. 2008) (same), *and United States v. Soliman*, 889 F.2d 441, 445 (2d Cir. 1989) (same). We need not conclusively decide whether Brown's challenge to the guidelines calculation was waived or forfeited, however, because, for the reasons explained below, he fails to demonstrate plain error.

**B. Grouping and Stacking**

Brown first argues that the district court erred in its application of the guidelines' grouping and stacking provisions.

15

Chapter 3, Part D of the Sentencing Guidelines Manual provides rules for determining a single offense level when a defendant is convicted of multiple counts. *See generally United States v. Feola*, 275 F.3d 216, 219 (2d Cir. 2001) (summarizing these rules). First, counts "involving substantially the same harm" are "grouped" together. U.S.S.G. § 3D1.2. Next, an offense level for each group is determined by using the offense level, enhanced by relevant conduct, for the most serious offense within the group. *Id.* § 3D1.3(a). The combined offense level is then determined by using the offense level for the group with the highest level, increasing that offense level based on the offense levels of the other groups, and finally decreasing the offense level as appropriate if the defendant accepts responsibility for his offense. *Id.* §§ 3D1.4, 3E1.1.

The district court correctly applied these provisions. As noted, the district court grouped Counts 1, 4, and 5 because they involved substantially the same harm. The court was required to group Counts 2 and 3 separately because Section 3D1.2(d) specifically prohibits grouping counts charging production of child pornography. The court then determined a combined offense level by using the offense level for Group 1, the group with the highest level, increasing that

16

offense level based on the levels of Groups 2 and 3, and decreasing the offense level based on Brown's acceptance of responsibility. We see no error, much less plain error, in how the district court grouped Brown's counts of convictions.

Nor do we see any error in the district court's application of the stacking provisions found in Chapter 5 of the Guidelines Manual. Section 5G1.2(d) provides that where there are multiple counts and the guidelines range exceeds the highest statutory maximum, the sentences are stacked and run consecutively "to the extent necessary to produce a combined sentence equal to the total punishment." Hence, the district court correctly determined that the guidelines range here was 110 years based on the stacking of the statutory maximums for the three production counts, which each carried a statutory maximum of 30 years, and the two possession counts, which each carried a statutory maximum of 10 years.

**C. The Enhancement for Violent and Sadomasochistic Conduct**

Brown next argues that the district court erred by applying a four-level sentencing enhancement for an "offense involv[ing] material that portrays sadistic or masochistic conduct or other depictions of violence," U.S.S.G. §

2G2.2(b)(4), despite the fact that Brown did not produce any sadistic images. Since it was Brown's production count that carried the highest offense level in Group 1, Brown is correct that his offense level should not have been increased based on the Section 2G2.2(b)(4) enhancement governing possession of child pornography. *See* U.S.S.G. § 3D1.3(a) & cmt. 2.

Nonetheless, Brown cannot demonstrate plain error because he cannot show that any error affected his substantial rights. *See McCrimon*, 788 F.3d at 78. Because Brown's total offense level of 51 exceeded the highest offense level listed in the sentencing table by more than four levels, Brown's guidelines range would have been identical even absent this enhancement. Any misapplication was therefore harmless. *See United States v. Cramer*, 777 F.3d 597, 603 (2d Cir. 2015) ("An error in Guidelines calculation is harmless if correcting the error would result in no change to the Guidelines offense level and sentencing range.").[2]

---

[2] If, on remand, the district court considers applying the parallel Section 2G2.1(b)(4) enhancement governing the production of child pornography, it must first decide whether the possession of sadomasochistic material was "relevant" to Brown's production of child pornography. *See* U.S.S.G. § 1B1.1, application note 1(H); *id.* § 1B1.3(a)(1); *see also United States v. Ahders*, 622 F.3d 115, 120 (2d Cir. 2010). To make such a finding, the district court must "provide at least some analysis of the relatedness . . . between [defendant's] possession of

18

## II. Procedural and Substantive Reasonableness

Brown also raises a more general challenge to the procedural and substantive reasonableness of his sentence.

As noted, in addition to ensuring that the district court properly calculated the guidelines range, we must also ensure that the district court committed no other significant procedural error, such as "treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51; *see also United States v. Aldeen*, 792 F.3d 247, 251 (2d Cir. 2015). We will not uphold a sentence as substantively reasonable unless we can first conclude that the district court adhered to these procedural requirements. *See United States v. Sindima*, 488 F.3d 81, 85 (2d Cir. 2007).

At sentencing, the district court noted "the trauma to these three children," the fact that "three children" would have to "worry for the rest of their li[v]e[s]" about the photographs, and that Brown "destroyed the lives of three specific

---

the images and his production of child pornography" and "point to facts in the record supporting its conclusion." *Ahders*, 622 F.3d at 122; *see also id*. at 123 (listing relevant factors for the district court to consider).

children." App'x at 100-01. The district court's explanation suggests that the individual harm suffered by each of Brown's three victims played a critical role in the district court's decision to impose three consecutive 20-year sentences. But the sentencing transcript also suggests that the district court may have misunderstood the nature of that harm as to Brown's third victim. Three times the court emphasized the mental anguish that "three specific children" would suffer as a result of Brown's abuse. App'x at 100-01. Brown's third victim, however, has "no knowledge of having been victimized by Brown." PSR ¶ 35. Her mother declined to submit a victim impact statement specifically because her daughter "was unaware of the abuse" and had experienced "no negative impact." PSR ¶ 51. To be sure, the district court was entitled to punish Brown for that abuse regardless of whether the victim was aware of it. But given the district court's repeated emphasis on the fact that Brown had destroyed the lives of "three specific children," we conclude that it is appropriate to remand for resentencing to ensure that the sentence is not based on a clearly erroneous understanding of the facts.[3] *See, e.g.*, *United States v. Corsey*, 723 F.3d 366, 376 (2d

---

[3] Our concern is not simply, as the dissent suggests, that the district court "did

Cir. 2013) (remanding for resentencing because record was ambiguous as to whether district court improperly treated the statutory maximum as the only reasonable sentence); *United States v. Cossey*, 632 F.3d 82, 88-89 (2d Cir. 2011) (remanding for resentencing where it was unclear whether district court sentenced defendant based on an appropriate or inappropriate consideration); *United States v. Juwa*, 508 F.3d 694, 699 (2d Cir. 2007) (remanding for resentencing where there was "uncertainty from both the sentencing transcript and the written order surrounding whether and to what extent the district judge based his sentencing enhancement on the assumption that Juwa had engaged in multiple instances of sexual abuse, as opposed to the single instance to which Juwa had anticipated pleading guilty in state court" (emphasis omitted)).[4]

---

not acknowledge" that the third victim "was sleeping at the time she was abused." Dissenting Op., *post* at 6. Rather, our concern is that the district court imposed a 20-year, consecutive sentence on Count Three because the court was under the mistaken impression that the third victim's life had been "destroyed," App'x at 101, when in fact she has "no knowledge of having been victimized by Brown," PSR ¶ 35, and, in the words of her mother, has suffered "no negative impact," PSR ¶ 51.

[4] The dissent contends that Brown did not sufficiently present this issue on appeal. Dissenting Op., *post* at 7-8. But, as the dissent acknowledges, we have discretion to consider arguments outside of an appellant's brief where "manifest

It is possible that, on remand, the district court will reimpose the same 60-year sentence that it imposed at the original sentencing. Although we express no definitive view on the substantive reasonableness of that sentence at this time, we respectfully suggest that the district court consider whether an effective life sentence is warranted in this case. *See United States v. Craig*, 703 F.3d 1001, 1002-04 (7th Cir. 2012) (Posner, *J.*, concurring) (expressing "the importance of careful consideration of the wisdom of imposing de facto life sentences").

We understand and emphatically endorse the need to condemn Brown's crimes in the strongest of terms. But the Supreme Court has recognized that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Graham v. Florida*, 560 U.S. 48, 69 (2010). As the Court explained in *Graham*,

---

injustice otherwise would result." *See United States v. Babwah*, 972 F.2d 30, 35 (2d Cir. 1992). Here, it is necessary to ensure that the sentence is not based on a clearly erroneous understanding of the facts before we can adequately review the substantive reasonableness of Brown's sentence. *See Sindima*, 488 F.3d at 85 ("Our ability to uphold a sentence as reasonable will be informed by the district court's statement of reasons (or lack thereof) for the sentence that it elects to impose." (alterations and internal quotation marks omitted)).

22

There is a line between homicide and other serious violent offenses against the individual. Serious nonhomicide crimes may be devastating in their harm[,] but in terms of moral depravity and of the injury to the person and to the public, they cannot be compared to murder in their severity and irrevocability. This is because life is over for the victim of the murderer, but for the victim of even a very serious nonhomicide crime, life is not over and normally is not beyond repair. Although an offense like robbery or rape is a serious crime deserving serious punishment, those crimes differ from homicide crimes in a moral sense.

*Id.* (citations, alterations, and internal quotation marks omitted). The sentencing transcript suggests that the district court may have seen no moral difference between Brown and a defendant who murders or violently rapes children, stating that Brown's crime was "as serious a crime as federal judges confront," App'x at 101, that Brown was "the worst kind of dangerous sex offender," App'x at 102, and that he was "exactly like" sex offenders who rape and torture children, App'x at 100.

Punishing Brown as harshly as a murderer arguably frustrates the goal of marginal deterrence, "that is, that the harshest sentences should be reserved for the most culpable behavior." *United States v. Newsom*, 402 F.3d 780, 785-786 (7th Cir. 2005). And "[t]hose who think that the idea of marginal deterrence should play some part in criminal sentences . . . might find little room left above

23

[Brown's] sentence for the child abuser who physically harms his victims, who abuses many different children, or who in other ways inflicts greater harm on his victims and society." *Id.* at 781, 785-86 (ordering limited remand for consideration of whether 324-month sentence imposed would be affected by *United States v. Booker*, 543 U.S. 220 (2005), where father produced child pornography of his daughter and his ex-girlfriend's daughter); *cf. also United States v. Aleo*, 681 F.3d 290, 293-95 (6th Cir. 2012) (vacating 60-year sentence for child pornography offenses as substantively unreasonable where grandfather filmed himself digitally penetrating his granddaughter). Moreover, while the district court appropriately recognized the need for the sentence imposed to afford adequate general deterrence, "sentencing judges should try to be realistic about the *incremental* deterrent effect of extremely long sentences." *Craig*, 703 F.3d at 1004 (Posner, *J.*, concurring).

Finally, to the extent that the district court believed it necessary to incapacitate Brown for the rest of his life because of the danger he poses to the public, we note that defendants such as Brown are generally less likely to reoffend as they get older. *See id.* at 1003-04 (citing studies showing that "[o]nly

1.1 percent of perpetrators of all forms of crime against children are between 70 and 75 years old and 1.3 percent between 60 and 69"). If Brown were ever released, he would still be subject to a lifetime term of supervised release and be required to register as a sex offender, further reducing his risk of recidivism.

We understand that balancing these and other concerns to arrive at a just sentence is a difficult and delicate task, and one that our system places primarily in the hands of district court judges. Our role as an appellate court is to determine only whether the sentence can be located within the "range of permissible decisions," and we will vacate a sentence as substantively unreasonable only when it is "so shockingly high, shockingly low, or otherwise unsupportable as a matter of law that allowing [it] to stand would damage the administration of justice." *Aldeen*, 792 F.3d at 255 (internal quotation marks omitted). Again, we express no view at this time as to whether a 60-year sentence for Brown's crimes meets this high standard. We will revisit that issue should the district court decide to reimpose the same 60-year sentence on remand.

## CONCLUSION

Because the sentencing transcript suggests that the district court may have based its sentence on a clearly erroneous understanding of the facts, we REMAND for resentencing in accordance with the procedures set forth in *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994), and in light of this opinion.

DRONEY, *Circuit Judge*, dissenting:

The majority simply disagrees with the length of the imprisonment imposed upon the defendant by the district court, yet it cloaks that disagreement as procedural error. There was no procedural error, and the sentence was well within the discretion of the district court. It was also appropriate. The defendant sexually abused at least three very young girls, recorded that abuse, installed secret cameras in public areas where children changed clothes, and possessed over 25,000 images of child pornography on his computers, including many scenes of bestiality and sadistic treatment. No doubt this was a lengthy sentence, but it was warranted.

I dissent. The district judge committed no error whatsoever—procedural or substantive.

## I.  Background

On March 21, 2012, Brown was indicted in the Northern District of New York on five counts: three counts of production of child pornography in violation of 18 U.S.C. §§ 2251(a), (e) and 2256(8) (Counts One to Three), and two counts of possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2) and 2256(8)(A) (Counts Four and Five).

Brown was sentenced to 60 years' imprisonment after pleading guilty to the three counts of production of child pornography—each in connection with a different young female victim—and the two counts of possession of child pornography. The three child victims in the production counts were identified as Jane Does 1 through 3. This was a below-Guidelines sentence; Brown's sentence calculated under the Guidelines was 110 years.

Brown has never objected to the factual portions of the Pre-Sentence Report ("PSR"). In addition, as part of his plea agreement,

he expressly admitted certain details of his criminal conduct. Although the majority gives a description of the nature of Brown's crimes, Majority Op. 3-8, a fuller description of the impact of Brown's crimes on the victims is important.

Many of the victims identified in the images that related to the two possession counts provided Victim Impact Letters to the district court prior to sentencing. In those letters, the victims recounted feelings of helplessness, depression, shame, and fear. In the words of one victim,

> My privacy and myself ha[ve] been violated and my pictures are on the internet all over the world. . . . Even though I've tried so hard to forget there's not a day that goes by that it doesn't affect me. . . . I break down into tears all of a sudden, I don't talk for a day, I get random flashbacks, I have horrible nightmares. . . . Now the pictures are spread all over the internet, and unfortunately it's beyond my control.

PSR at 36-37. In the words of another victim, "[b]eing sexually abused is something you never forget, . . . . [b]ut when you have photographs of your abuse on the Internet, . . . it makes it even more

3

impossible to keep it in your past and move on from it. It is like the abuse is still happening." PSR at 41.

As to the three counts of the indictment which charged production of child pornography, the families of Jane Doe 1 and Jane Doe 2 spoke at Brown's sentencing. They described the significant behavioral issues that these girls suffer, and how the girls struggle to maintain relationships with family and friends. For example, Jane Doe 1's family explained that Jane Doe 1 blames herself for what happened. She experiences frequent nightmares in which Brown "chas[es] her with [his] phone and camera." App. 84. Jane Doe 1's grandmother recounted witnessing these nightmares and hearing Jane Doe 1 scream, "Get him off me, get him off me." App. 84. Jane Doe 1 was nearly held back in school and required one-on-one tutoring and counseling services. Jane Doe 2's family similarly described how Jane Doe 2 suffers from guilt and nightmares, has difficulty trusting other people, and has required extensive

4

treatment, including medication and counseling. The families told the district court that both they and the girls "feel violated in the worst imaginable way" and that the girls "live in fear" and continue to "struggle[] with what happened." App. 83. Jane Doe 3, Brown's ex-wife's sister, PSR ¶ 61, did not submit a Victim Impact Statement or speak at sentencing.

At sentencing, the district court accepted the PSR's Guidelines calculation. At Criminal History Category I and offense level 43, Brown's recommended sentence under the Guidelines was initially life imprisonment. However, because each count was subject to a statutory maximum, Brown's Guidelines sentence became 110 years. Brown's counsel stated that Brown had no objection to this calculation.

The district court sentenced Brown to 60 years' imprisonment, imposing 20-year consecutive terms on Counts One through Three (the production counts related to victims Jane Does 1 through 3),

and 10-year terms on Counts Four and Five (the possession counts) to be served concurrently with one another and with its sentence on the production counts.

## II. Procedural Reasonableness

On appeal, Brown raises—for the first time—two challenges to his Guidelines calculation: (1) that the district court misapplied the Guidelines' grouping and stacking provisions and (2) that the court erroneously applied an enhancement for material depicting sadistic or masochistic conduct. Despite rejecting these challenges, *see* Majority Op. 15-18, the majority nonetheless concludes that Brown's sentence was procedurally unreasonable on a basis not raised before the district court or on appeal: that Jane Doe 3 was sleeping at the time she was abused and recorded by the Defendant, and the district court did not acknowledge that at sentencing. Because the district court imposed a consecutive sentence of 20 years for the production

count related to Jane Done 3, the majority concludes, the sentence must be vacated.

While the majority faults the district court for "misunderst[anding] the nature of [the] harm as to Brown's third victim," Majority Op. 20, Brown's only discussion of any factual error by the district court appears in his brief's description of the case's procedural history, where he writes that "Judge Sharpe erroneously emphasized the pictures' supposedly violent and or sadistic aspects." Appellant's Br. at 10. This has nothing to do with the district court's understanding of the harm inflicted upon Jane Doe 3. And while Brown quotes portions of the district court's statement at sentencing which the majority finds troubling, Appellant's Br. at 40, Brown does so only in the context of an unrelated challenge to the substantive reasonableness of his sentence. This is insufficient to raise the issue on appeal. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently

7

argued in the briefs are considered waived and normally will not be addressed on appeal.").

While we have discretion to consider arguments outside an appellant's brief where "manifest injustice would otherwise result," *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005), no such extreme circumstances warrant exercise of that discretion here.[1]

_____

[1] In addition to the arguments discussed above, Brown also argues that the district court erred by (1) finding that he had not demonstrated remorse for his crimes and (2) "erron[e]ously believ[ing] that [Brown] produced violent or sadomasochistic child pornography." Appellant's Br. 31. The majority did not rely on these arguments as a basis for vacatur, and for good reason. As to the first argument, the district court's finding did not affect Brown's Guidelines range; in accepting the PSR's Guidelines calculation, the district court in fact reduced Brown's offense level by three levels for acceptance of responsibility. Moreover, the assessment of whether Brown had demonstrated remorse was well within the province of the district court, and there was no clear error in the court's finding. *Cf. United States v. Cousineau*, 929 F.2d 64, 69 (2d Cir. 1991) ("[T]he district court['s] [conclusion that the defendant] . . . had not shown remorse or acknowledged the wrongfulness of the conduct for which he was convicted . . . . is entitled to great deference . . . ."). As to the second argument, although the images Brown possessed on his computer but did not produce were the ones that depicted violent or sadomasochistic conduct, the district court's remarks at sentencing demonstrate that the court distinguished between the production and possession counts, *see* App. 100 (discussing production counts and stating that those counts did not "obviate the last counts of the indictment, which [are] the possession of the child pornography"), and was aware that the sadistic and violent images at issue were *produced* by other individuals and

8

Even assuming that the majority properly reached this issue, I cannot agree that the district court procedurally erred by stating that Brown "destroyed the lives of three specific children," App. 101, simply because Jane Doe 3 was asleep at the time Brown sexually abused and photographed her. *See* Majority Op. 20. The majority concludes that the district court's "repeated emphasis on the fact that Brown had destroyed the lives of 'three specific children,'" is reason "to remand for resentencing to ensure that the sentence is not based on a clearly erroneous understanding of the facts." *Id.*

Unlike the majority, I do not find that the court's comments "suggest[] that the district court may have misunderstood the nature of that harm as to Brown's third victim." *Id.* In making the comment about the "three specific children," the court was

---

*possessed* by Brown, *see id.* ("[T]he possession of the child pornography [counts] . . . result[] in identifying 294 additional victims and a hundred ninety-four known victim series, . . . and those pictures involving torture, sexual intercourse, bestiality and bondage. . . . The children depicted in . . . those photographs, did not volunteer to participate in torture, sexual intercourse, bestiality and bondage.").

discussing the need for specific deterrence in light of the significant harm Brown caused to the victims in both the child pornography that he produced and possessed. *See* App. 101-02. However, when discussing the severity of Brown's actions toward Jane Does 1, 2, and 3, and its relationship to the severity of the sentence imposed, the court explained, "When I look at the first three counts and look at the specific children that are involved, then I have to say to myself which one of [them] didn't you abuse? And my answer to that is there isn't none of the three that you didn't abuse." App. 102. Not only did the district court specifically note that a factor important to it in imposing Brown's sentence was "Jane Doe III, [and that Brown] ejaculate[ed] on her *while she was sleeping*," App. 100 (emphasis added), but also said that it had read the presentence report, App. 77, 101, which specifically states that Jane Doe 3 was asleep, PSR ¶¶ 27, 35, and presently unaware of the abuse. PSR ¶ 51.

While it is true that Jane Doe 3 may have been unaware that Brown molested her and recorded it, this does not mean that the court committed procedural error by concluding that Brown "abuse[d]" her, App. 102, or that a significant sentence was not warranted on Count Three. That Jane Doe 3 was asleep does not change the fact that Brown placed his penis on her hand, ejaculated on her hands and feet, and pulled aside her underwear to touch her vagina, all while taking pictures and videos that he later uploaded to his computer for future viewing.[2] Simply because Jane Doe 3 did not know of Brown's actions then does not mean she will not learn of them in the future. When she does discover what occurred, she will have to live with the fact that she was violated in a deplorable way by a close family member.

---

[2] Although the images of Jane Doe 3—like the images of Jane Doe 1 and Jane Doe 2—were produced by Brown and uploaded to his computer, it is not clear whether images of Jane Doe 3 were shared on the Internet, as the images of Jane Doe 1 and Jane Doe 2 were. It is also not clear, however, that they were *not* shared.

11

Like Jane Doe 1, Jane Doe 2, and the many other victims represented in the Victim Impact Letters that were before the district court for the counts of possession of child pornography, Jane Doe 3 will also be exposed to the fear and uncertainty of whether the photographs that Brown produced will be viewed by others. The district court correctly recognized this fear when it stated "the three children here worry [] for the rest of their li[ves]," App. 100, about whether photographs of their abuse have or will be viewed by others. Jane Doe 3 is as likely to experience this uncertainty and fear as the other victims, regardless of whether she currently remembers the abuse.

That Jane Doe 3 was asleep when she was abused must also be considered in the context of Brown's other abuse and misconduct. Brown admitted to sexually assaulting three victims; Jane Does 1, 2, and 3. The presentence report also indicated that there were two additional victims, Victims 4 and 5. PSR ¶ 37. Brown had numerous

computer files of these two additional victims. PSR ¶ 36. However, law enforcement was unable to establish the identities of these two minors, and Brown's production of these images was not charged in the Indictment. But Brown did not object to the presentence report before sentencing and the district court specifically inquired whether there were any objections to the PSR at sentencing; there were none. App. 78. Victim #4 was eight or nine years old and was photographed opening her vagina, and Victim #5 was an unknown infant.[3] PSR ¶ 37. The identified victims Brown abused ranged in

---

[3] At sentencing, the government provided that the nature of the images of Victims #4 and 5 "were different" as "they involved a hidden camera where the images may not be considered sexually explicit, but they captured two minors changing in and out of their clothing." App. 80-81. The government continued, stating "there were two additional victims, Jane Doe VI and VII" who were "also secretly filmed with a hidden camera changing in and out of their clothes." App. 81. The government appears to have made this statement in error as the PSR states that "images of Victim #4 depicted a female approximately eight to nine years old with black hair opening her vagina and wearing a cartoon t-shirt" and that images of Victim #5 "depict an unknown infant." PSR ¶ 37. The PSR goes on to provide that "[i]mages were *also* located of unknowing victims obtained by the defendant hiding a pinhole camera at various locations." PSR ¶ 38 (emphasis added). The PSR provides that four children were filmed by the pinhole camera: an identified minor female who was unaware she was a victim, Brown's son, and two unidentified children who were taped changing out of their swimwear. PSR ¶ 38. Victims #4 and 5 are not those children, identified by the government at

age from eight to eleven years old. Forensic analysis of Brown's computer revealed 44 files of child pornography produced of Jane Doe 1, 12 files of Jane Doe 2, 39 files of Jane Doe 3, 33 files of Victim #4, and 2 files of Victim #5. In addition, over 25,000 images of child pornography, including depictions of bondage, bestiality, and what appeared to be an intoxicated minor, were recovered on Brown's computers. PSR ¶¶ 36, 41. Brown also placed a pinhole camera in various locations, including in a hamper at a pool party and at a hotel bathroom in a Lake George waterpark, which recorded children changing out of their swimwear. PSR ¶ 38.

I therefore cannot conclude from either Brown's sentence or the district court's explanation for that sentence that the court "misunderstood" the harm to Jane Doe 3 when it imposed a consecutive sentence of 240 months' imprisonment on Count Three.

---

sentencing as Victims #6 and 7, depicted in images and videos obtained by Brown's placement of the pinhole cameras.

## III.   Substantive Reasonableness

Although the majority purports not to express a "definitive view on the substantive reasonableness of [the] sentence," Majority Op. 22, it nonetheless urges the district court to consider whether the imposed sentence is truly warranted and suggests that a lesser sentence is required.  Based on the court's statements analogizing Brown to "the worst kind of dangerous sex offender," App. 102, and his offense conduct as "as serious a crime as federal judges confront," App. 101, the majority suspects "the district court may have seen no moral difference between Brown and a defendant who murders or violently rapes children."  Majority Op. 23.  The majority also faults the district court in stating that Brown "was 'exactly like' sex offenders who rape and torture children."  Majority Op. 23 (quoting App. 100).

15

I disagree. The district court did not say that Brown was "exactly like" sex offenders who rape and torture children, as the majority suggests. The court's remarks were as follows:

> The possession of child pornography is not a victimless crime. The children depicted in . . . those photographs, did not volunteer to participate in torture, sexual intercourse, bestiality and bondage. They were hijacked by people exactly like you, Mr. Brown, put through those events, had them photographed, and as the three children here worry about for the rest of their life, those photographs are out there forever, as is demonstrated by the fact that somebody like you can retrieve [them] and continue to victimize [them].

App. 100-101. Thus, the court did not indicate that Brown was as morally culpable as an individual who rapes or tortures children. Rather, in making these statements, the court was emphasizing that Brown not only committed the serious crime of *possessing* over 25,000 images of child pornography, but also committed the even more serious crimes of *producing* child pornography of multiple child victims forced to engage in sexual acts. It was in this sense—

16

that he was a "producer" of child pornography—that Brown was "exactly like" those who created the images that he possessed.

The other statements cited by the majority do not show that the district court, in fact, viewed Brown's conduct as the worst crime a defendant could commit. On the broad spectrum of criminal conduct, Brown's conduct was not as severe as that of a murderer or an individual who rapes or tortures a child. *See* Majority Op. 23-24. The district court's comments—read in context—were meant to emphasize the severity of Brown's many crimes in contrast to crimes of lesser severity, rather than to suggest that his crimes were in fact the "most severe" he could have committed. Thus, in describing Brown as the "worst kind of dangerous sex offender," the district court explained, "You're not just one who looks at photographs obtained over the internet. You're one who puts that penchant in action, as is demonstrated here." App. 102. The court therefore was simply explaining that Brown's conduct was more serious than that

17

of an individual who possesses, but does not produce, child pornography.

While the court did not expressly compare Brown's crimes to more severe offenses—such as murder, torture, or rape—an express discussion was not required. *See United States v. Pereira*, 465 F.3d 515, 523 (2d Cir. 2006) (finding no error where the district court did not expressly consider certain § 3553(a) factors). I therefore disagree that the district court's language signaled error or an inability to see a "moral difference" between Brown and a defendant who murders or violently rapes children. Nor do I believe this is one of those "exceptional cases where the trial court's decision 'cannot be located within the range of permissible decisions.'" *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *United States v. Rigas*, 490 F.3d 208, 238 (2d Cir. 2007)).

Brown repeatedly engaged in sexual contact with at least three young girls between the ages of eight and eleven while he

photographed and videotaped the abuse. This contact is captured in the images themselves, which show each victim's underwear being pulled aside while her genital area is touched; an adult penis in one victim's hand, next to one victim's mouth, and on one victim's lips; and Brown ejaculating onto one victim's hands and feet.

Brown's actions were calculated. He produced the images of Jane Doe 1 and Jane Doe 2 at Jane Doe 2's mother's trailer home when they were entrusted to his care on various occasions. He also sought to bring the girls to Lake George just weeks after producing pornographic images and videos of Jane Doe 3 in the same location. He even offered to buy Jane Doe 1 an iPad in exchange for the ability to take additional photographs. Brown also admitted to hiding a pinhole camera in bathrooms at specific locations where they were likely to capture images of children nude, including a public waterpark, and did not object to the PSR's description of the production of child pornography of Victims #4 and 5.

Brown's conduct resulted in the production of 145 still images and three videos of the identified victims and additional images of two unidentified victims. Several of the pornographic images of Jane Doe 1 and Jane Doe 2 were uploaded to the Internet.[4] Brown also downloaded over 25,000 still images and 365 videos of child pornography, including still images depicting torture, bondage, and bestiality.

All of these undisputed facts, taken together, weighed in favor of a particularly severe sentence for Brown's convictions on the three production and two possession counts. Nevertheless, the district court imposed a sentence that was well-below Brown's recommended Guidelines range.

This case is not *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010). In *Dorvee*, the defendant was sentenced to the statutory maximum of 240 months' imprisonment after pleading guilty to one

---

[4] Brown has denied uploading the images but acknowledged that no one else had access to the images or was aware of their existence, such that someone else could have uploaded them.

count of *distribution* of child pornography. *See id.* at 176. Dorvee's conviction arose from sexually-explicit conversations that he had online with two undercover police officers that he believed to be teenage boys. *Id.* Dorvee was arrested when he arrived at a meeting with one of the "boys," after indicating that he wanted to photograph and engage in sexual conduct with the "boy." *Id.* A search of Dorvee's computers revealed several thousand still images and approximately 100 to 125 videos of minors engaging in sexually explicit conduct. *Id.*

We found Dorvee's within-Guidelines sentence to be substantively unreasonable. *Id.* at 188. The district court had "apparent[ly] assum[ed] that Dorvee was likely to actually sexually assault a child," but this assumption was "unsupported by the record evidence," which demonstrated that Dorvee had never had any actual sexual contact with children. *Id.* at 183-84. The record also contained medical and psychiatric expert reports that Dorvee

was unlikely to initiate a relationship with a child. *Id.* at 183. We found that application of the Guidelines as applied in Dorvee's case led to an irrational result, observing that the Guidelines resulted in a greater sentence than had he been convicted of "actually engag[ing] in sexual conduct with a minor." *Id.* at 187.

Brown *did* have actual sexual contact—repeatedly—with multiple young victims, and Brown engaged in the *production* of child pornography during the course of this abuse. We have repeatedly upheld lengthy sentences in production cases post-*Dorvee*, recognizing a distinction between production and possession, particularly in production cases involving sexual contact with victims. *See United States v. Oehne*, 698 F.3d 119, 125 (2d Cir. 2012) (per curiam) ("*Dorvee* is readily distinguishable . . . . Unlike the defendant in *Dorvee*, Oehne actually sexually assaulted a child. . . . He photographed the abuse and distributed the images over the internet, where they have been viewed by thousands

22

worldwide. . . ."); *United States v. Broxmeyer*, 699 F.3d 265, 291 (2d Cir. 2012) ("[T]his case is distinguishable [from *Dorvee*] in presenting ample record evidence of Broxmeyer actively engaging minors in sexual conduct, for purposes of both photographing it and participating in it."); *see also United States v. Hamilton*, 548 F. App'x 728, 730 (2d Cir. 2013) (summary order) ("Insofar as Hamilton argues that such lengthy sentences should be 'reserved [for] intentional murder,' we find such an argument unavailing. Nor are we persuaded that a life sentence in the case at bar overstates the 'seriousness of the offense,' *see* 18 U.S.C. § 3553(a)(2)(A), given Hamilton's role in producing graphic child pornography by filming himself sexually abusing children as young as four years old.").

The record at Brown's sentencing amply demonstrates that the district court considered all of the § 3553(a) factors, and gave particular weight to the seriousness of Brown's criminal conduct. *Cf. United States v. Snyder*, 425 F. App'x 64, 65 (2d Cir. 2011)

(summary order) ("While the district court did make reference to the circumstances of the crime and expressed anger and disgust, a reading of the record as a whole indicates the district court considered all of the Section 3553(a) factors."). The court's emphasis on the severity of Brown's crimes and emphatic language was warranted. *See United States v. Flores-Machicote*, 706 F.3d 16, 23 (1st Cir. 2013) ("Sentencing judges are not automatons, and a judge is entitled to view certain types of crime as particularly heinous.").

Given the seriousness of Brown's offenses and the need to protect the public from further crimes of this defendant[5] and others, the below-Guidelines sentence imposed in this case was well "within the range of permissible decisions." *Cavera*, 550 F.3d at 191; *see, e.g., United States v. Brown*, 613 F. App'x 58, 60 (2d Cir. 2015)

---

[5] The majority takes note of Brown's age and states that "defendants such as Brown are generally less likely to reoffend as they get older," and cites to an opinion by Judge Posner for support. Majority Op. 24-25. But Judge Posner noted in the same concurrence that "sex offenders are more likely to recidivate than other criminals." *United States v. Craig*, 703 F.3d 1001, 1004 (7th Cir. 2012) (Posner, J., concurring).

24

(summary order) (upholding 720-month sentence as substantively reasonable in conspiracy to produce child pornography case); *United States v. Rafferty*, 529 F. App'x 10, 13-14 (2d Cir. 2013) (summary order) (upholding 720-month sentence as substantively reasonable for four counts of producing child pornography and one count of possessing child pornography); *cf. United States v. Klug*, 670 F.3d 797, 801 (7th Cir. 2012) ("[T]his court has upheld lengthy sentences for defendants involved in producing child pornography, even where the victims were not molested in the process. [For example,] . . . an 80-year sentence was affirmed . . . . [where a] defendant . . . babysat the young son of his stepbrother but abused his position of trust by taking nude photos of the child while he slept."). I would therefore find Brown's sentence to be substantively reasonable.